525 So.2d 1097 (1988)
STATE of Louisiana
v.
John K. RICHARD.
No. 87-KA-810.
Court of Appeal of Louisiana, Fifth Circuit.
April 18, 1988.
*1098 Martha E. Sassone, Indigent Defender Bd., Gretna, for appellant.
John M. Mamoulides, Dist. Atty., W.J. LeBlanc, Dorothy A. Pendergast, Ass't. Dist. Attys. (Louise Korns, Office of the Dist. Atty., of counsel), Gretna, for appellee.
Before CHEHARDY, BOWES and GAUDIN, JJ.
CHEHARDY, Chief Judge.
John Kirk Richard appeals his conviction, by a jury, of second-degree murder (LSA-R.S. 14:30.1) and the resulting mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
Defendant was charged with the first-degree murder of his mother-in-law, Mabel Ruth Bates Fowler, who was found stabbed to death in her apartment on November 3, 1986. Fowler sustained 19 cuts and stab wounds from her face to her knees. The cause of death was determined by autopsy to be a neck wound that severed the internal carotid artery. Later that day defendant was arrested and charged with killing Fowler.

FACTS
The evidence established that defendant had been married to Fowler's daughter Christine Knorr; that Christine, the defendant and their baby had shared Fowler's apartment until a little more than a month before the murder, when Fowler had ejected the defendant from the apartment for his behavior to Christine; and that Fowler's 13-year-old daughter Claire Greenwood also resided in the apartment, located in Gretna, Louisiana.
The events preceding Fowler's death were as follows:
During the evening of November 2, 1986, Christine was at work at a Pizza Inn near Fowler's apartment when she received a telephone call from her estranged husband, the defendant, in which he told her, "No matter what happens, remember I still love you."
At 11:00 p.m., Christine left work with a co-employee, Edmund Williams, whom she was dating. As the two walked to Williams' car, Christine noticed the defendant's car parked in a nearby lot, facing the apartment complex. She was not surprised to see the car because the defendant had been following her for a couple of weeks. She and Williams went to Fowler's apartment; Fowler, Claire and the baby were there. Christine changed clothes and left *1099 with Williams about 11:45 p.m. As they walked out of the apartment, Christine heard the defendant's car start; she recognized its sound because it had a faulty muffler. She looked over to the parking lot and saw the car accelerate and "peel out," but she did not see it leave the lot.
About 15 minutes later, Claire went onto the front balcony of the apartment. She saw defendant standing in the courtyard, wearing blue jeans and a black jacket that she recognized. Claire went back inside and told Fowler, who told her not to worry about it.
Fowler and Claire watched television until 12:50 a.m., when Fowler went into Christine's bedroom to check on the baby. Claire heard a noise that sounded like something hitting the wall of the bedroom; she attempted to enter, but the door felt as if it were being held shut and she could not get it open. She could hear Fowler screaming for help. Claire ran to her brother's apartment, about two blocks away, to summon help.
William Knorr, Fowler's son, was wakened by Claire pounding on his front door. He called his two brothers-in-law for assistance, picked up a baseball bat, and the three men went to Fowler's apartment. The brothers-in-law stayed by the front door while William Knorr went to the back door. He waited for five minutes, but no one exited, whereupon he returned to the front door and the three men entered. They found all the lights in the apartment on. (Claire testified that all the lights were off except the television when she left the apartment to get her brother.) After searching the apartment, William Knorr discovered his mother's body on the floor of Christine's bedroom. He left the apartment and asked a neighbor to call the police.
Detective Daniel Wright, who arrived at the apartment at 1:38 a.m. in response to the call, saw Fowler lying on the bedroom floor when he entered. He discovered that the bedroom window, a sliding window adjacent to a balcony, was unlocked.
Following information received in interviews with Claire Greenwood, Christine Knorr, William Knorr and others, Detective Wright and Lieutenant Vincent Lamia surveilled defendant's apartment from 5:30 a.m. until daylight. While waiting, they noticed that the hood of defendant's car was warm, indicating recent use. At 6:40 a.m., the officers knocked on defendant's door and requested he come to the Criminal Investigation Bureau with them. Defendant dressed and voluntarily accompanied the officers. He was coherent and alert; the officers noticed there were fresh cuts and abrasions on his right hand and a scratch on his left arm, for which he had no explanation.
At the police station defendant voluntarily gave a statement, in which he denied being at Fowler's apartment any later than 3:00 p.m. on November 2, 1986, when he had returned his infant son after visitation. Defendant admitted he had entered Christine's bedroom through the window approximately two weeks after Fowler had ordered him to move out of the apartment.
The defendant signed consent-to-search forms for his apartment and his automobile, as well as a consent to allow a sample of his blood to be taken. In searching the car, police found vinyl from the driver's door panel and a notebook that appeared to have blood on them. On searching the residence, they found a pair of jeans, a dark blue T-shirt, a blue suitcase, a backpack, and a wine flask, each with apparent blood stains, as well as a folding knife and a book entitled Make Your Family Happy. The black jacket the defendant wore to the police station was also seized and found to have blood on it.
The blood stains were analyzed; the results were inconclusive in some cases or consistent with the defendant's blood type in others. No blood was found on the knife. The defendant could offer no explanation for the presence of the blood.
Dr. Alvaro Hunt, an expert in forensic biology, testified he performed the autopsy on Fowler, during which he found a total of 19 cuts and stab wounds on the body from face to knees. Some, on the victim's left arm, were consistent with "defense wounds." The cause of death was a neck *1100 wound that severed the internal carotid artery. Dr. Hunt, when shown the knife seized from defendant's residence, stated that it could have caused the wounds on the victim's body. He also testified that, if the perpetrator had been standing on the other side of the victim's body, he would not have gotten bloody.
Christine Knorr and Claire Greenwood both testified that defendant had resided with them until a month before the homicide, when Fowler threw him out. Claire testified she had seen defendant in possession of a knife like the one seized. She stated she had found the knife after defendant was ejected from the apartment and she had hidden it in a cookie jar, but that a week before Fowler was killed defendant had demanded she return the knife to him, which she did.
Christine testified that the defendant had broken into her bedroom through the window during the night several times before the killing. The first time was the same day defendant was ejected; she said when she walked into the bedroom, she discovered defendant, who grabbed her by the mouth and held a knife to her throat. After talking to her, he said that if she told Fowler he had been there he would return and kill her. The second time was a week later, when he again broke into her bedroom, armed with a knife.
Following that visit, Christine said, she called the apartment maintenance office to have the window lock repaired. She assumed the repair was made, although she did not see anyone do it. Four days before the homicide, however, the defendant again entered the bedroom through the window; this time he was unarmed. He told Christine he blamed her mother for the breakup of their marriage and he showed her a knife. She testified that the knife police seized from his apartment was like the one defendant used when he broke into her bedroom, and also stated she had not reported the break-ins to the police because she feared defendant would hurt her family.

ASSIGNMENTS OF ERROR
The defendant made 19 assignments of error; most of these, however, were not briefed on appeal (specifically, Assignments 2, 3, 6, 7, 9, 10, 11, 12, 13, 15 and 16). Accordingly, they are considered abandoned. Uniform Rules, Courts of Appeal Rule 2-14.2. We shall address the other assignments of error in the order in which defendant argues them in his brief on appeal.

ARGUMENT I (ASSIGNMENTS OF ERROR NOS. 4 & 8)
In Assignment of Error No. 4, the defendant asserts the trial court erred in denying his motion for testimony of the witnesses as to the condition of the courtyard at the time of the commission of the crime. In Assignment of Error No. 8, he asserts the trial court erred in not allowing the jury to visit and observe the courtyard outside the apartment in which the crime occurred.
We find no merit to these assignments. These issues were previously raised in this court by writ application (No. 87-KA-475), in which a panel of this court found no error in the trial court's ruling, with the following comment:
"Considering this application, which includes a portion of the trial transcript, we are unable to say that the trial judge abused his wide discretion in refusing to allow the jury to go to the crime scene and in not allowing a non-expert (actually an associate of the attorney representing relator) to testify about conditions not necessarily the same as on the night the victim was murdered. See State v. Sweeney, 443 So.2d 522 (La.1983) and also State v. Moore, 432 So.2d 209 (La. 1983)."
In his brief on appeal, the defendant has raised no issues on these points that were not raised and considered by the writ application. Accordingly, these need not be addressed on appeal. See State v. Yelverton, 515 So.2d 828 (La.App. 5 Cir.1987); State v. Butler, 462 So.2d 1280 (La.App. 5 Cir. 1985).

*1101 ARGUMENT II (ASSIGNMENT OF ERROR NO. 18)
Defendant assigns as error any and all errors patent on the face of the record. Our review of the record discloses several patent errors, but none of them are reversible error.
Specifically, the defendant was sentenced immediately after the trial judge denied his motion for new trial, but the record does not indicate that the defendant waived the three-day sentencing delay required by LSA-C.Cr.P. art. 873. However, there is no showing of prejudice as a result of the failure to comply with that article; the trial court had no discretion in sentencing, as the life sentence is mandatory for the crime of which he was convicted. Accordingly, a remand for resentencing is not required. State v. White, 404 So.2d 1202 (La.1981).
Another error is that the minute entry for the sentencing and the commitment do not reflect that the sentence was imposed without benefit of probation, parole or suspension of sentence. In the transcript, however, the trial judge clearly states that the sentence is to be served without these benefits. Where there is a discrepancy between the minute entry and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983).
Accordingly, we shall order that both the sentencing minute entry and the commitment be amended to reflect that the sentence is without benefit of probation, parole or suspension of sentence.
The last patent error we find is that the minute entry, the transcript and the commitment all fail to show that defendant was given credit for time served. LSA-C. Cr.P. art. 880 requires a court, when imposing sentence, to give a defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. Accordingly, we shall order the commitment and minute entry amended to give the defendant credit for time served.

ARGUMENT III (ASSIGNMENT OF ERROR NO. 19)
In this assignment defendant asserts the evidence presented by the State was not sufficient to justify the verdict rendered. He argues the evidence was insufficient because it fails to prove defendant had specific intent to kill, an essential element of the crime of second degree murder.
Specific criminal intent exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act. LSA-R.S. 14:10(1). Specific intent, being a state of mind, need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. LSA-R.S. 15:445.
The severity of the attack on the victim, in which she was stabbed 19 times, indicates that the defendant had the specific intent to kill or to inflict great bodily harm when he stabbed the victim. See State v. Segura, 464 So.2d 1116 (La.App. 3 Cir. 1985), writ denied 468 So.2d 1203.

ARGUMENT IV (ASSIGNMENTS OF ERROR NOS. 5 & 14)
In these assignments defendant argues that the trial court erred in admitting into evidence photographs of the victim's body, which he asserts are prejudicially gruesome.
In State v. Moore, 498 So.2d 82 (La.App. 5 Cir.1986), we stated, at 84:
"The test used in determining admissibility of photographs is whether the probative value of an allegedly gruesome photograph outweighs its prejudicial effect upon the jury, State v. Dean, 487 So.2d 709 (La.App. 5th Cir.1986). The evidence, of course, must also be relevant for some purpose, and a balance must be struck between the evidentiary value of the photograph and its tendency to overwhelm reason and to associate the accused with the atrocity without sufficient evidence, State v. Sterling, 377 So. 2d 58 (La.1979). Generally, photographs of the body of the deceased victim have been held relevant to prove the death, to corroborate other evidence of the cause *1102 of death, to establish the location, severity and number of wounds, and to prove the identity of the victim, State v. Dean, supra, State v. Bennett, 454 So.2d 1165 (La.App. 1st Cir.1984)."
In this case the identity of the victim was not at issue. However, the jury was required to determine whether the defendant had specific intent to kill or to inflict great bodily harm.
The photographs to which defendant objects are the following: S-1the face, neck and upper chest of the victim, displaying a large wound of the left cheek; S-2the lower legs of the victim, showing stab wounds to the right knee; S-3the neck, lower face and left upper arm, illustrating two "through-and-through" wounds at the armpit; S-4the abdomen and legs, showing three wounds on the lower extremities; S-5 and S-6the head, neck and upper chest, depicting three wounds to the neck, one of which was the fatal wound; S-7 the victim's back, showing a chest wound that penetrated through the diaphragm into the spleen; and S-8the victim's left forearm, showing the defense wounds.
We find these photographs are relevant to show the severity of the attack, which is pertinent to the contested issue of specific intent. Accordingly, this assignment lacks merit.

ARGUMENT V (ASSIGNMENT OF ERROR NO. 17)
In this assignment, defendant argues that the mandatory life sentence for second degree murder is excessive. However, this argument has consistently been rejected by the Louisiana Supreme Court. See, e.g., State v. Graham, 422 So.2d 123 (La.1982). The decision to provide mandatory life sentences for certain felonies is within the prerogative of the legislature. State v. Parker, 416 So.2d 545 (La.1982). Accordingly, there is no merit to this assignment.

ARGUMENT VI (ASSIGNMENT OF ERROR NO. 1)
In this assignment, defendant asserts the trial court erred in denying his motion to suppress the evidence. He argues the searches of his apartment and his car were illegal, contending his consent to the searches was not free and voluntary.
Defendant contends he was not adequately informed of his right to refuse the search. He also contends he was coerced and intimidated by the detectives who questioned him over an eight-hour period; he alleges that they refused to allow him to use the bathroom and that he was not offered or provided with any food or drink.
The testimony taken at the hearing on the motion to suppress establishes that the defendant was taken by Detective Wright and Lieutenant Lamia to the Criminal Investigation Bureau at about 7:00 a.m. Upon arrival, Detective Wright informed defendant of his constitutional rights as required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and defendant initialed the printed rights form, indicating he had read the form. The defendant also signed a waiver-of-rights form, indicating he understood and had waived his rights to counsel and against self-incrimination.
At 8:00 a.m., Lieutenant Lamia advised defendant of his right against warrantless searches and his right to refuse consent to such a search; then defendant signed forms giving consent to searches of his residence and his car. At 2:13 p.m., defendant made a statement in which he denied involvement in the homicide. At 3:00 p.m. defendant was again advised of his right against warrantless searches, by Detective Wright, and he signed a consent form to have blood withdrawn.
Both police officers testified that no threats, coercion or promises were used to obtain defendant's signature on any of the consent forms. Wright testified that defendant did not ask to use the bathroom during his detention, but Wright did not recall whether defendant was given or requested any food or drink. Lamia testified defendant was given a beverage and allowed to use the bathroom around 2:00 p.m.
The record reflects that defendant's educational level was 1½ years of college. He read and signed the consent-to-search *1103 forms, which contain the statement, "I have been advised of my constitutional rights not to have a search made without a search warrant and my rights to refuse to consent to such a search." Thus, we find no merit to his claim he was not adequately informed of his right to refuse consent.
Nor do we find merit to his claim that poor treatment coerced him into signing. The forms consenting to the searches of his apartment and car were signed at 8:00 a.m., only one hour after he arrived at the Criminal Investigation Bureau. Deprivation of bathroom use and refreshments would be unlikely to have affected him after only an hour.
For the foregoing reasons, defendant's conviction and sentence are affirmed. The case is remanded and the district court is ordered to correct the commitment and the minute entry of the sentencing to reflect that the sentence is to be served without benefit of parole, probation or suspension of sentence, and to reflect that defendant is to be given credit for time served to the date of imposition of sentence.
AFFIRMED AND REMANDED WITH ORDER.