566 So.2d 1098 (1990)
STATE of Louisiana, Appellee,
v.
Bobby Ray HENDERSON, Appellant.
No. 21576-KA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 1990.
*1099 Walter V. Kendrick, Jonesboro, for appellant.
William J. Guste, Jr., Atty. Gen., John C. Blake, Dist. Atty., George M. Meadors, Asst. Dist. Atty., Homer, for appellee.
*1100 Before NORRIS, LINDSAY and HIGHTOWER, JJ.
NORRIS, Judge.
The defendant, Bobby Ray Henderson, was indicted for aggravated rape. LSA-R.S. 14:42. His first trial ended in mistrial because of a hung jury. The instant (second) trial, held in April 1989, resulted in a jury verdict of guilty as charged. The court imposed the mandatory sentence of life in prison at hard labor without benefit of parole, probation or suspension of sentence. Henderson now appeals, urging four assignments of error; 23 other assignments, neither argued nor briefed, are abandoned. URCA-Rule 2-12.4; State v. Williams, 338 So.2d 672 (La.1976). For the reasons expressed, we affirm.

Facts
The victim, "R.H.," was a slightly-built 45-year old lady who is now remarried. On the evening of May 20, 1988 she was returning home from a date with her future husband, "J.O." Both testified that they left J.O.'s house at 10:00 p.m. From there it was about a ten minute drive to R.H.'s former home on James Street in Homer. Both testified that on arrival they sat in his truck talking for five to 10 minutes. Then R.H. left the truck and walked to her door, which because of the shape of the house is not visible from where J.O. was parked. J.O. testified he backed out partway in an effort to shine some light her way, but she was out of sight once she turned the corner. He waited a few moments, backed out of the driveway and returned home. R.H. removed her house key from the mailbox and unlocked the front door. She then heard the sound of someone running between her house and the next. Thinking it might be her 18-year-old son, she turned away from the door to see who was there.
She saw a man wearing a white tank-top shirt and loud red-print "jam" shorts dart from beside her house. He swerved around the front porch and grabbed her before she could react. With both hands on her shoulders, he pushed her in the door.
The assailant, whom R.H. had seen only once before but recognized as the defendant, forced her to the floor. They knocked over a potted plant near the door; she put up a struggle in the spilt soil but was unable to break loose. After Henderson managed to slam the door he overpowered her. He clasped his right hand over her mouth and stripped off her jeans and panties with the left. He pulled down his shorts and raped her though she continued to resist. They grappled into the living room, where he raped her again. He pushed up her shirt and bra and slobbered on her breasts; she was afraid he would leave marks on her.
By this time they were close to a lit lamp. Henderson said, "Now that you've seen my face what are you going to do about it?" R.H. testified she feared he would kill her to keep her from identifying him. She hit him in the eye and he clutched her throat, saying, "I'll kill you." Then he loosened his grip and instructed her to get on hands and knees and stay out of the light. She offered to turn off the lamp, hoping he would let her go long enough to grab a small spray can of mace she had hidden near the lamp some weeks earlier. Fooled by this ruse, Henderson let go of all but one wrist. With her free hand R.H. grabbed the mace and squirted him. The spray was not strong. Infuriated, Henderson seized her again and thrust her onto the couch, still clutching tight. R.H. managed a second squirt of mace. Suddenly Henderson let go, wheeled around and charged out the door. R.H. ran to the porch and saw him take off between the two houses, the same way he had approached, in the general direction of a nearby apartment complex. By this time she had a good look at his face and clothing.
R.H. went inside, locked the door, put on her jeans and called the sheriff's office. The dispatcher, Dep. Harris, received the call at 10:39 p.m. She radioed units of both the sheriff's office and Homer police. She kept R.H. on the phone and got a description of the assailant: a black male with a *1101 short beard, wearing short pants, recently sprayed with mace and possibly heading for Claiborne Place Apartments. Though her dispatcher notes did not record the direction of the suspect's flight, Dep. Harris remembered relaying this and the physical description to several officers. Officer Faulk was the first to arrive at the scene; R.H. gave him the additional details that the suspect was in a white shirt and red and white jam shorts.
Deputy Shirey also headed for R.H.'s house but when he heard by radio that help had already arrived, he doubled back to the apartments to look for the suspect. At the complex he talked to some people and decided to drive back toward R.H.'s house. As he neared the intersection of Branch and King Streets he saw a black man walking out of a roadside ditch onto the shoulder. The man, who was wearing a white tank top, red/orange and white jam shorts and Converse tennis shoes, walked up to Dep. Shirey's unmarked car at a swift pace. Dep. Shirey got a good look. Though the man's eyes were "teary" and he was scratched about the neck and chest, Dep. Shirey recognized him as Bobby Ray "Battlin" Henderson, who came up and spoke. Dep. Shirey smelled mace on him. While Dep. Shirey was talking to Henderson, Officers Lafitte and Taylor pulled up. Both officers recognized Henderson and thought he met the general description; they decided to detain and Mirandize him. He was taken into custody at 10:44 p.m. Later that night he was arrested and formally charged.
When Henderson was in custody at the sheriff's office, R.H. went there to view a lineup. She identified Henderson as her assailant. A few days later she viewed a photo lineup and picked him again. She also identified him at trial.
Dr. Tyler performed sex crime kits on both victim and suspect the night of the incident. He verified that there was dirt in R.H.'s groin area; she identified this as potting soil from the overturned plant. He found saliva on her breasts and semen in her vagina. Mr. Wojtkiewicz, the expert who examined the samples, testified that Henderson is a blood-type B secretor; though the saliva was too dilute to test, the semen was from a blood-type B secretor, as were semen tracks on Henderson's white tank top. Although corresponding blood type secretions do not make for a positive match, this type is peculiar to 15% of the black male population. R.H. is a blood-type A secretor.
On the second day of voir dire, Henderson's attorney filed a motion for change of venue, alleging prejudicial pretrial publicity. The court took this under advisement and denied the motion on the second day of trial, April 26. At voir dire, 42 jurors were examined; 28 had heard something about the case. Of these, 26 said what they heard would not influence them in any way; the other two were excused for cause. Nine of the jurors ultimately seated had read or heard something about the case; five were seated after the defense had exhausted its peremptory challenges.
The defense challenged for cause prospective juror Kirk Andrews because he worked as a sergeant at Wade Correctional Institute. The court denied the challenge; the defense used a peremptory challenge on him. The jury included two blacks and a black alternate.
As noted, the jury unanimously found Henderson guilty as charged by verdict of April 27, 1989. On May 2 the court imposed the mandatory sentence of life in prison at hard labor without benefit of parole, probation or suspension of sentence.

Discussion: Change of venue
By his first assignment Henderson urges the trial court erred in denying his motion for change of venue. In support he cites State v. Faciane, 233 La. 1028, 99 So.2d 333 (1958), which actually antedates the current Code of Criminal Procedure. LSA-Acts 1966, No. 310, § 7. He also refers to advertisements for rape seminars in local papers and public broadcast messages on a daily basis after the incident. The state's brief says that the defense filed "copies of newspaper articles pertaining to the case," *1102 but we find no such exhibits in evidence; at any rate, no one has described the content of the articles or broadcasts.
Change of venue is regulated by LSA-C. Cr.P. art. 622, which provides:
Art. 622. Grounds for change of venue
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
A number of factors are considered in determining whether a change of venue is appropriate. These include (1) the nature of the pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events in the community that might affect or reflect the candor and veracity of prospective jurors on voir dire. State v. Bell, 315 So.2d 307 (La.1975); State v. Hall, 549 So.2d 373 (La.App. 2d Cir.1989), writ denied 556 So.2d 1259 (La.1990). The court may also consider the level of publicity in the area to which venue could be changed; the care exercised and the ease encountered in selecting the jury; the prospective jurors' familiarity with, and resultant effects of, the publicity; the peremptory challenges and challenges for cause exercised by the defendant in jury selection. State v. Berry, 329 So.2d 728 (La.1976); State v. Henry, 446 So.2d 1308 (La.App. 2d Cir.1984). The defendant bears the burden of proving that he cannot obtain a fair trial in the parish where the prosecution is pending. State v. de la Beckwith, 344 So.2d 360 (La.1977). The trial court has great discretion in granting or denying a motion for change of venue. State v. Flood, 301 So.2d 637 (La.1974), cert. denied 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). A reviewing court may nevertheless make an independent valuation of the facts to determine whether the accused received a trial that was free and unfettered by outside influences. State v. David, 425 So.2d 1241 (La.1983), cert. denied after remand 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986).
The record does not show the nature or content of the allegedly prejudicial publications. Admittedly 28 of 42 venire members had heard something about the case, but only two formed an opinion and they were excused for cause. Apparently the news items were not strong or widespread enough to pollute the jury venire. There is no allegation that government officials cooperated in the broadcast of the news releases, as in State v. Bell, supra. The 11 months between the offense and trial was moderate, but longer than in State v. Hall, supra, and State v. Wilkerson, 403 So.2d 652 (La.1981). The alleged offense was unquestionably notorious. Claiborne Parish is not large, but fair trials can be held in smaller parishes. There is no proof of other events in the community or other factors that would diminish the frankness and truthfulness of potential jurors on voir dire or witnesses at trial. In sum, the defense has made a strong showing as to one factor, severity of the offense, and a fair showing as to two.
The state concedes there was some publicity (though the record is utterly devoid of documentary evidence) but urges this is insufficient for reversal. In State v. Wilkerson, supra, a state policeman and a Delhi city marshal pursued and stopped a car they suspected was stolen. The occupants drew handguns on the officers, disarmed them, forced them into the back seat, drove them to a bean field and shot them several times. Both officers survived, but it was still a notorious crime and the defendants were charged in Richland Parish, a fairly small parish, with aggravated kidnapping, which was then a capital offense. They *1103 sought a change of venue, introducing copies of newspaper articles and transcripts of radio broadcasts; they also alleged that 20 to 25 of the 82 or 83 prospective jurors admitted on voir dire that they were prejudiced against the defendants. The motion was denied. The Supreme Court, tracking the criteria of State v. Bell, supra, found the defendants had proved three of the factors but still failed to make the proof required by art. 622; the trial court had not abused its discretion in refusing to move the trial. In the instant case, Henderson's showing as to three factors is similar but the proof not as strong as in Wilkerson.
We are naturally sensitive to the fact that just because the court succeeds in drawing a jury does not mean the defendant has no grounds to seek a change of venue. See LSA-C.Cr.P. art. 622, Official Revision Comment (b). We have carefully reviewed the voir dire transcript. The prospective jurors' familiarity with the case was moderate at best; they largely denied that any form of publicity affected their ability to answer and judge fairly. There is no hint of bias in the trial testimony. On this record we would be inclined to hold the defense has not proven that it could not obtain a fair and impartial trial in Claiborne Parish. However, the trial court presided over voir dire, observing the tenor and texture of the proceedings. From its superior vantage point it found insufficient evidence to grant the motion; from ours we cannot find this conclusion to be an abuse of discretion.
This assignment does not present reversible error.

Challenge for cause
By his fifth assignment Henderson urges the trial court erred in denying his challenge for cause of prospective juror Kirk Andrews, who was a field sergeant at Wade Correctional Institute. The defense timely objected and used a peremptory challenge; Mr. Andrews did not serve on the jury. In support of its claim that the ruling was wrong, Henderson cites State v. Ware, 478 So.2d 790 (La.App. 3d Cir.1985).
Challenges for cause are governed by LSA-C.Cr.P. art. 797, which provides in part:
Art. 797. Challenge for cause
The state or the defendant may challenge a juror for cause on the ground that:
* * * * * *
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict[.]
Henderson argues in essence that Mr. Andrews's employment with Wade, a state prison facility, would have influenced him in reaching a verdict. Criminal jury service by someone associated with law enforcement duties must be closely scrutinized. State v. Chapman, 410 So.2d 689 (La.1982). An actively employed criminal deputy sheriff has been found not competent to serve on a criminal jury. State v. Simmons, 390 So.2d 1317 (La.1980). Numerous cases, however, hold that people with prior law enforcement connections are competent to serve on a criminal jury. See, e.g., State v. Jones, 474 So.2d 919 (La. 1985), cert. denied 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); State v. Chapman, supra; State v. Ware, supra. Cases also hold that people currently employed as corrections officers are competent to serve. State v. Smith, 466 So.2d 1343 (La. App. 3d Cir.1985); State v. Valentine, 464 So.2d 1091 (La.App. 1st Cir.1985), writ denied 468 So.2d 572 (La.1985). The linchpin is whether the prospective juror's position might have produced relationships or attitudes that would disqualify him as a juror, and disqualification must be brought out on voir dire and shown by the record. State v. Chapman, supra.
Prospective juror Andrews testified that he did not know the D.A.; that as a field sergeant at Wade he merely supervised the field crew to make sure they came on and off duty on time; that his work would not influence him in any way; *1104 that he could be fair and would have no problem applying the law as instructed by the court. Andrews's position at Wade appears no different from that of any other supervisor or overseer; it has no special affiliation with law enforcement. His situation, in fact, is almost identical to those in Smith and Valentine, supra. Under close scrutiny, Andrews was not shown to be partial because of his employment. We perceive no abuse of discretion.
Interestingly, two other prospective jurors who also worked at Wade showed the full spectrum of affiliation with law enforcement. Prospective juror Richard Stalder was the warden at Wade; he said he works professionally with the sheriff's office and knows the D.A.; and he considered his a law enforcement position. Mr. Stalder's situation was similar to that shown in State v. Simmons, supra; the defense challenged him for cause and the court sustained the challenge. Another prospective juror, James L. Jackson, testified simply that he "worked at Wade" in an unspecified capacity. R.p. 382. The defense accepted him and he served on the jury. The point is that not every connection with law enforcement will disqualify a prospective juror from serving. The trial court did not err, on this record, in refusing to grant a challenge for cause of Mr. Andrews.
We would finally note that Mr. Andrews was peremptorily challenged and did not serve on the jury. This is not an instance where an improper juror served. Moreover, Henderson does not allege that he accepted a questionable juror in an effort to save peremptory challenges. Thus there is no showing of prejudice. LSA-C. Cr.P. art. 921; State v. Vanderpool, 493 So.2d 574 (La.1986); State v. Copeland, 530 So.2d 526 (La.1988). This assignment does not present reversible error.

Sufficiency of evidence
By his second and third assignments Henderson urges the trial court erred in receiving a verdict of aggravated rape, as the evidence warranted only a verdict of forcible rape. He argues the definitions of aggravated and forcible rape, though similar, suggest two categories, of which aggravated rape is reserved for force that prompts the "utmost" resistance from the victim; he contends the evidence does not prove beyond a reasonable doubt that R.H. resisted to the utmost.
The constitutional standard of review for sufficiency of evidence to support a conviction is whether, viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Byrd, 385 So.2d 248 (La.1980).
Rape is defined as the act of anal or vaginal intercourse with a male or female person who is not the spouse of the offender, committed without the person's lawful consent. Emission is not necessary and any sexual penetration, however slight, is sufficient to complete the crime. LSA-R.S. 14:41.
Henderson was charged with aggravated rape, which carries a mandatory sentence of life in prison at hard labor without benefit of parole, probation or suspension of sentence. It is defined in LSA-R.S. 14:42 as follows:
§ 42. Aggravated rape
A. Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution. * * *
The lesser included offense of forcible rape, which Henderson claims the state proved, carries a maximum sentence of 40 years in prison at hard labor, including at *1105 least two years without benefit. It is defined in LSA-R.S. 14:42.1 as follows:
§ 42.1. Forcible rape
A. Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape. * * *
Henderson correctly points out that the definitions of aggravated and forcible rape are similar. The Supreme Court discussed the relationship between these definitions in State v. Parish, 405 So.2d 1080 (La.1981) (on rehearing). Both require proof that intercourse occurred without the victim's lawful consent and the victim is prevented from resisting the act by threats of great harm under circumstances where she reasonably believed resistance would be futile. Aggravated rape includes the alternative element of the victim resisting to the utmost but being overcome by force. Thus the "only distinction between aggravated and forcible rape is the degree of force employed and the extent to which the victim resists." State v. Parish, supra at 1087; State v. Turnbull, 377 So.2d 72 (La. 1979). The court found the legislative aim was to divide the continuum of offenses into two categories based on the degree of force employed. The jury is authorized to render verdict in accordance with the degree of force proved. The range of permissible punishment is to fit the severity of the crime. In Parish, supra, the defendant was charged with attempted aggravated rape; the Supreme Court found the evidence supported a finding of only "minimal" force, and entered a verdict of attempted forcible rape.
The instant case is factually different from Parish. R.H.'s testimony describes a desperate struggle. This is corroborated by the physical evidence of the overturned flower pot and the potting soil found in her groin area by Dr. Tyler; by the mace that Dep. Shirey and Ofc. Lafitte smelled on Henderson's person; and by the scratches that Dep. Shirey noticed on his neck. True, R.H. admitted she gave up the struggle twice. The first time, Henderson overpowered her. R.p. 503. This is not surprising, as the trial court said she was "slightly built" while Henderson weighed 200 lbs. and "worked in the woods." R.p. 1053 (sentencing). The second time it was part of her ruse to escape and seize the mace; this may well have saved her life, and does not deprecate his degree of force. The fact that she momentarily gave up the fight as a defensive (and successful) ploy does not mean she failed to put up the utmost resistance and should not inure to his benefit. Viewing this evidence in light most favorable to the state, a rational trier of fact could have concluded the state proved beyond a reasonable doubt that Henderson exerted great force and overcame R.H.'s utmost resistance.
This assignment does not present reversible error.

Error patent review
The designated errors do not present reversible error. We have further reviewed the record for error discoverable by a mere inspection of the pleadings and proceedings. LSA-C.Cr.P. art. 920(2). The guilty verdict was returned on Thursday, April 27, 1989, at 5:47 p.m. Sentence was imposed on Tuesday, May 2 at 9:30 a.m. LSA-C.Cr.P. art. 873 sets a mandatory delay of three days between felony conviction and sentence. The defendant can always waive the delay but there is no evidence of waiver in the record. With this delay, which excludes Saturday and Sunday, sentencing cannot occur until the fourth day at the earliest. State v. Johnson, 275 So.2d 405 (La.1973); LSA-C.Cr.P. art. 13. The fourth day after Henderson's conviction would have been Wednesday, May 3. The instant sentence was technically premature; courts often remand for resentencing. See State v. Davis, 278 So.2d 130 (La.1973), aff'd after remand 284 So.2d 896 (La.1973), cert. denied 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 836 (1975).
A judgment shall not be reversed, however, for any error which does *1106 not affect the substantial rights of the accused. LSA-C.Cr.P. art. 921. The harmless error rule applies to art. 873 sentencing delays. See State v. Williams, 460 So.2d 1100 (La.App. 2d Cir.1984), writ denied 466 So.2d 1299 (La.1985). Here there is no showing that slightly early sentencing prejudiced Henderson. He does not claim that he was deprived of the right to move for a new trial. Moreover, there is no sentencing discretion for this offense, so he cannot claim the trial court passed a hasty, uninformed sentence. See State v. Richard, 525 So.2d 1097 (La.App. 5th Cir.1988), writ denied 538 So.2d 609 (La.1989). This error was harmless and we detect no other errors in the proceeding.
For the reasons expressed, the conviction and sentence are affirmed.
AFFIRMED.