660 So.2d 529 (1995)
STATE of Louisiana, Plaintiff-Appellee,
v.
Joe HUFF and James Huff, Defendants-Appellants.
No. 27,212-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1995.
*531 Randy E. Collins, Shreveport, for Joe Huff, appellant.
Thomas A. Wilson, Shreveport, for James Huff, appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, W. Stanley Lockard and Catherine M. Estopinal, Assistant District Attorneys, for appellee.
Before MARVIN, BROWN, and WILLIAMS, JJ.
MARVIN, Chief Judge.
After being convicted by a jury of second degree murder of a Shreveport cab driver, the brothers Joe and James Huff appeal, assigning ten errors including the sufficiency to convict each brother and the trial court's denial of Joe Huff's motion for severance.
We affirm.

DISCUSSION
In criminal appeals, we review the evidence in the light that most favorably supports the jury verdict. In that light we determine whether the evidence, direct and circumstantial, is sufficient to allow a rational juror to conclude beyond a reasonable doubt that the State proved every element of the crime of which the accused was convicted. LRS 15:271, 15:438; Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.E.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
The standard of review for the sufficiency of circumstantial evidence to convict is not a stricter standard than for the sufficiency of direct evidence to convict, but is simply a method that directs the trier of fact and the reviewing court to question, objectively, or to focus on, the reasonableness of the asserted or arguable hypotheses of innocence. If the trier of fact or the reviewing court finds the asserted or arguable hypotheses of innocence unreasonable, circumstantial evidence is sufficient to convict beyond a reasonable doubt. LRS 15:271, 15:438, Jacobs, supra; State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).

FACTS
We summarize the factual conclusions the jury could have drawn: About 11:36 p.m. on August 3, 1992, a Yellow Checker Cab Company dispatcher received a telephone call requesting that a cab be sent to the Exxon station at Hearne Avenue and Interstate 20 in Shreveport. Cab 126, driven by the victim, Daniel Gardner, was directed at 11:48 p.m. to pick up that fare. In his shirt and *532 pants pockets Gardner kept a small amount of money with which to make change for fares. He kept a greater amount of money and larger bills in a bank bag concealed beneath the carpet under the driver's seat of his cab.
About 11:41 p.m. on that night, James Huff successfully placed a collect telephone call from that Exxon pay telephone to a female friend, Tracey Coleman, who with her sister had been with the Huffs at their Desoto Street apartment in Shreveport earlier that night. James Huff told her during the course of the 10-15 minute telephone conversation that Joe Huff had telephoned for a cab. When Gardner's cab arrived at the Exxon station near midnight, James, wearing a gray and white striped shirt, entered the front passenger seat, while Joe got in the back seat. Joe Huff had been seen at the apartment by others earlier that night, and as late as 11:10 p.m., handling or holding a black revolver in the presence of James who wore a gray and white striped shirt. The brothers requested and obtained several cigarettes from Tracey Coleman's sister at that time.
On that night, the Exxon station attendant recognized Joe and James Huff conversing on the station pay telephone and getting in the cab when it arrived, they being patrons of that station who lived on Desoto Street about six blocks away.
Shortly before midnight on August 3 an off-duty city police officer saw Gardner's cab parked on the northern-most westbound shoulder of I-20, west of the Hearne Avenue-I-20 Exxon station. The cab was between the Hearne Avenue and Jewella Avenue intersections with I-20. Two men, who were seen and described by the officer and corresponding to the physical appearance of the Huffs, were standing on the passenger side of the parked cab. As the off-duty police witness drove closer, the two men ran northerly off I-20, jumping the fence of the state fairgrounds near the vicinity of Hudson Street, a major north-south traffic artery that traverses underneath I-20 and enters the state fairgrounds. Desoto Street, where the Huffs resided in a garage apartment at municipal number 2825, is south of the fairgrounds and I-20, about six blocks from the Hearne Avenue-I-20 Exxon station. The fairgrounds are immediately north of I-20 and the Exxon station.
About midnight on August 3 another cab driver for the Yellow Checker Cab Company, Ron Woods, who knew Gardner and his cab number, was driving westerly on I-20 with his adult stepdaughter who was also employed by the cab company. Seeing Gardner's cab stopped with its front and rear right side (passenger) doors open and the windshield broken, he stopped his cab and backed it up to investigate. Woods's stepdaughter found Gardner bloody and slumped over in the front seat. She used Woods's cab radio to cause the company dispatcher to alert police and medical personnel. The bank bag Gardner routinely kept beneath his seat was never found.
Shreveport police received telephone notification of the incident at 12:04 a.m. August 4. Police photos show the cab windshield shattered by a bullet hole, the disarray of carpet and area beneath the driver's seat, and the location of a fingerprint of James Huff on the cab.
From tire tracks off the shoulder of I-20 leading to the parked cab, police witnesses established that the cab left the highway and traveled some 240 feet and around a light standard before returning toward the highway and stopping on and near the paved shoulder at a small pile of cement or similar debris. The cab dispatchers led police to continue their investigation where Gardner was last dispatched, the Hearne AvenueI-20 Exxon station. Thereafter they began searching for James and Joe Huff.
Bullets or fragments thereof were obtained from Gardner's head and the cab, all of similar caliber and apparently fired from a .357 or .38 caliber revolver. The fingerprint on Gardner's cab matched James Huff's right middle fingerprint. A particle having characteristics of gunshot residue was found on James Huff's left hand when the appropriate test was made after the Huffs were arrested.
Gardner was shot twice in the back of his head, the fatal bullet being extracted therefrom. The other bullet exited his head. Police *533 produced the gray and white striped shirt, found on Hudson Street and stained with blood consistent with Gardner's blood, that witnesses identified as the shirt being worn by James Huff before and when he entered the cab. The bloodstains on the shirt were inconsistent with the blood of the Huffs.
Hudson Street is the only street in the fairgrounds area that allows a vehicle or pedestrian to cross underneath I-20 that is not an I-20 traffic interchange. The two men who were seen by the off-duty police officer at the cab shortly before midnight on August 3 ran north and jumped the fence, entering the fairgrounds near, and running in the direction of, Hudson Street. The shirt was found on Hudson Street at the I-20 underpass. The Huffs' garage apartment is south of the fairgrounds and I-20.
The Huffs were arrested uneventfully the morning of August 4 at their garage apartment on Desoto Street. Neither made any detailed statement to the police nor testified before the jury.

SUFFICIENCY OF THE EVIDENCE ASSIGNMENTS ONE, TWO AND SIX, IN PART
When the assignments include the sufficiency of the evidence to convict and other errors, the reviewing court is directed to review the sufficiency assignment first. State v. Hearold, 603 So.2d 731 (La.1992).
To convict of second degree murder the State was required to prove the Huffs killed Daniel Gardner either when they had a specific intent to kill or to inflict great bodily harm or when they were engaged in the perpetration or attempted perpetration of an armed robbery, even though without an intent to kill or inflict great bodily harm. LRS 14:30.1 A(1) and (2). The State also had to prove beyond a reasonable doubt that each brother was "concerned in" the commission of the armed robbery so as to be a "principal" and committing each element of that crime. LRS 14:24. A principal to an armed robbery in which the victim is fatally shot by another may be convicted of second degree murder. State v. Stokes, 26,003 (La.App. 2d Cir. 6/22/94), 639 So.2d 395, writ denied.
The time and distance factors strongly indicate that on the night of August 3-4, 1992, the Huffs intended to shoot and to rob a cab driver quickly in the immediate vicinity of the apartment where they lived. As late as 11:10 p.m. on that night the brothers bummed cigarettes at their apartment from one of two female visitors, while one brother held or handled a revolver. About 11:36 p.m. on that night they telephoned for a cab to come to the Exxon station only six blocks from their apartment. They waited for the cab while making other telephone calls from that location. The cab driver was dispatched to proceed to the Exxon station at 11:48 p.m. When the cab later arrived between 11:48 and 11:55 p.m., James got in the front seat and Joe got in the back seat and the cab drove away.
Gardner drove the cab away from the Hearne AvenueI-20 Exxon station and entered I-20, heading west. After driving only a few hundred feet on I-20 westbound, Gardner was shot twice in the back of his head with a .357 or .38. caliber pistol. The shots were fired from the back seat of the cab. The cab left the paved highway and traveled some 240 feet on the shoulder and around a light standard before turning back toward the paved highway and stopping partly on the paved shoulder not far from the Exxon station. This fact strongly indicates that one or the other Huff steered and stopped the cab. The cab was seen in its parked location about 11:55 p.m. by an off-duty police officer. The two men who were described as resembling Joe and James Huff ran north from the cab, jumping the fence into the fairgrounds near the Hudson Street underpass of I-20.
Shortly thereafter Woods and his stepdaughter, after stopping to investigate, caused the cab dispatcher to alert police. Gardner was still bleeding. The police were alerted at 12:04 a.m. The carpet and area beneath the driver's seat were in "disarray" and Gardner's bank bag, always with him when he worked and usually concealed under the carpet beneath the driver's seat, was missing. James Huff's striped shirt was discarded *534 and was later found on the Hudson Street underpass, at a location within a few blocks of the apartment on Desoto Street where the Huffs resided. The discarded shirt was stained with blood analytically proved consistent with Gardner's blood and inconsistent with the blood of either James or Joe Huff. The police search found James Huff's bloodstained shirt, but did not find Gardner's bank bag or the murder weapon.
The fact that police found that Gardner's shirt pocket and pants pocket contained some cash, less than $100, and the fact that the two men who rapidly fled and jumped the fence as the off-duty officer drove by, strongly indicate that the armed robbers intended to complete the robbery-killing as quickly as possible and to flee the scene as close to their apartment as possible.
On this record, we conclude the evidence, direct and circumstantial, was legally sufficient to convict beyond a reasonable doubt both James and Joe Huff, as principals, of the crime of second degree felony murder, the killing of Daniel L. Gardner during the perpetration of the armed robbery of Daniel L. Gardner. The jury could have concluded beyond a reasonable doubt that Joe Huff fired bullets from a black revolver when in the back seat of the cab into the head of Gardner and that James Huff, who got Gardner's blood on his shirt when he had to lean over the fatally wounded Gardner and steer and stop the cab and search for and obtain Gardner's bank bag from beneath the driver's seat, got in the front seat of the cab at the Exxon station for that purpose.

ADMISSIBILITY ASSIGNMENTS ASSIGNMENTS THREE, EIGHT, AND TEN
Hearsay. Defendants assign as error the trial court's allowing the following question and answer by Tracey:
Q: Did you ask James what he was doing at that Exxon station?
A: He said that Joe had called a cab.
The defense characterizes this as double hearsay, the first statement being what Joe said to the cab dispatcher and the second statement being James's statement to Tracey that Joe had called for a cab.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LCE Art. 801C. Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided by legislation. LCE Art. 805. Because the brothers were tried jointly, we review the trial court's decision to allow this testimony with respect to each defendant separately.
Joe Huff. As to Joe Huff, the first statement was a party admission. A statement offered against a party which is his own statement is a personal admission and is not hearsay by definition. LCE Art. 801D(2)(a). James's statement to Tracey describing what Joe did immediately after he did it is a present sense impression and is an exception to the hearsay rule. LCE Art. 803(1). Tracey's testimony was properly admitted with respect to Joe Huff.
James Huff. As to James, Joe's statement, whatever it was, concerning the call for a cab is not offered for the truth of the matter asserted. It was properly admitted to show James's state of mind at the time he talked to Tracey, shortly before he was seen entering a cab. James's belief that Joe had called a cab, making it possible for the brothers to rob the driver, goes to James's intent to commit armed robbery. Thus the first statement is not hearsay with respect to James. LCE Art. 801C. As discussed above, James's statement to Tracey was a present sense impression and was properly admitted as an exception to the hearsay rule. LCE Art. 803(1). Other witnesses established that a cab was requested and dispatched to the Exxon station and was entered by Joe and James Huff. Any assumed error is thus harmless. This assignment has no merit.
Discovery Violation. The State introduced three slips for fares to which cab 126 was dispatched on August 3. All three were obtained from the Yellow Checker Cab Company *535 the day following the murder by police detective Michael Price. The first, referring to the request for a cab at the Exxon station at Hearne and I-20, was identified and introduced through the testimony of Yellow Checker's operator and dispatcher from that night.
The Huffs argue that during discovery the State only disclosed the existence of the first dispatch slip. They assert that they were not given the other two dispatch slips, a violation of the rules of discovery in the Code of Criminal Procedure. They claim the trial court committed error by allowing the introduction of the two undisclosed slips.
The State had a duty to disclose these slips to the defendants under their motion for discovery. CCrP 718. Being a continuing duty, the State was required to notify the defendants promptly once it had decided to use the two undisclosed slips. CCrP 729.3.
The failure of the State to comply with discovery procedure does not automatically mandate reversal. The defendants must show prejudice in order for their convictions to be reversed. State v. Ray, 423 So.2d 1116 (La.1982); State v. Williams, 25,835 (La.App. 2d Cir. 2/23/94) 632 So.2d. 893. Where the defendants have been lulled into a misapprehension of the strength of the State's case by the failure to disclose fully, such a prejudice may then constitute reversible error. State v. Sweeney, 443 So.2d 522 (La.1983); State v. Downing, 451 So.2d 1221 (La.App. 2d Cir.1984). We are required to review the record to determine whether any prejudice which may have resulted from the non-compliance caused the trier of fact to reach the wrong conclusion. Sweeney, supra; Williams, supra.
The State asserts these slips were intended to be used, if necessary, for rebuttal evidence. Once the State decided to use the slips, it had a duty to disclose that intention to the defense. The slips were only introduced to corroborate the testimony of the operator and the dispatcher concerning the malfunction of the date stamp (July 34 [sic]) and the unlikelihood that the first slip had been confused with another from a different day. The time of day on the stamps was not in question. Although the State did violate its continuing duty to disclose, there was no prejudice to defendants by the admission of this undisclosed evidence. We find this assignment without merit.
Photographs. The Huffs argue that the coroner's photos should not have been admitted into evidence because they were shocking and overly prejudicial.
Photographs which illustrate any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible. LCE Art. 401; Stokes, supra. Autopsy photographs are admissible to corroborate other evidence establishing the cause of death, the manner in which the death occurred, and the location, severity, and number of the wounds. State v. Bourque, 622 So.2d 198 (La.1993); State v. Harvey, 26,613 (La.App. 2d Cir. 1/25/95), 649 So.2d 783.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. LCE Art. 403. The test for admissibility of gruesome photographs is whether the prejudicial effect of the photographs clearly outweighs their probative value. Bourque, supra; Harvey, supra.
The photos complained of were used by the coroner to explain the position and direction of the gunshot wounds. These photos, while not pleasant, are hardly gruesome or shocking. Even assuming that they may be characterized as gruesome, their probative value is not outweighed by any assumed prejudicial effect. See and compare the types of photos admitted in Bourque, supra; in State v. Perry, 502 So.2d 543 (La.1986), U.S. cert. denied, U.S. reh. denied; and State v. Copeland, 530 So.2d 526 (La.1988), U.S. cert. denied, U.S. reh. denied.

MOTION FOR SEVERANCE ASSIGNMENT FOUR
Joe Huff assigns as error the trial court's denial of his motion to sever. He argues that had the trial been severed, James's bloodied shirt and fingerprint would *536 have been inadmissible against him. We disagree.
Article 704 of the Code of Criminal Procedure states in pertinent part: Jointly indicted defendants shall be tried jointly unless:... (2) the court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
A determination as to whether to grant or to deny a severance rests in the sound discretion of the trial court. A ruling on a severance motion will not be reversed on appeal absent a clear showing that the trial court abused its discretion. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Dukes, 609 So.2d 1144 (La.App. 2d Cir.1992), writ denied.
Contrary to Joe's assertion, the presence of James's fingerprint on the cab and the evidence concerning the blood on the shirt would be admissible if Joe were tried separately. This evidence is relevant to corroborate other evidence of who was where in the cab when Daniel Gardner was shot in the back of his head. Joe has failed to show that justice required a severance and the trial court abused its discretion. This assignment is without merit.

PREMATURE SENTENCING ASSIGNMENT FIVE
The Huffs assign as error the trial court's sentencing them the same day it denied their motions for a new trial and for post-verdict judgments of acquittal.
If a defendant convicted of a felony files a motion for a new trial, or in arrest of judgment, sentence shall not be imposed until at least twenty-four hours after the motion is overruled, unless the defendant expressly waives the delay. CCrP Art. 873.
A judgment shall not be reversed for any error which does not affect the substantial rights of the accused. CCrP Art. 921; State v. Henderson, 566 So.2d 1098 (La.App. 2d Cir.1990). The penalty for committing second degree murder is mandatory life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. LRS 14:30.1B.
The defendants filed motions for a new trial and for post-judgment verdicts of acquittal, which were argued and denied. The defendants do not assert that they were prejudiced by the premature sentencing. Because the trial court had no discretion in the sentencing for this offense, the premature sentencing cannot be said to have affected the court's decision about what sentence to impose. We find no merit in this assignment.

CLOSING ARGUMENT ASSIGNMENT SEVEN
Here the Huffs argue the State went beyond the scope of the evidence presented and made prejudicial remarks in closing argument. Specifically they complain of the prosecutor stating what occurred when the victim was shot, that an armed robbery occurred, that the defendants could have deduced where cab drivers hid money, that the bank bag was taken from the cab, and that the defendants were destitute and needed money.
The law requires the argument to be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. CCrP Art. 774. An appellate court should not reverse on grounds of improper closing argument unless it is thoroughly convinced the remarks influenced the jury and contributed to its verdict. Bourque, supra; State v. Eaton, 524 So.2d 1194 (La.1988), U.S. cert. denied, U.S. reh. denied; Harvey, supra.
While the prosecution must base its conclusions and deductions in closing argument upon evidence adduced at trial, both the State and the defense are entitled to their respective conclusions as to what is or is not established by the evidence, and either may press upon the jury any view arising out of the evidence. State v. Kennon, 588 So.2d 1348 (La.App. 2d Cir.1991); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied.
*537 The remarks of which the defendants complain are reasonable conclusions which may be drawn or inferred from the facts in evidence. The arguments made were not improper.

MOTION FOR POST-VERDICT JUDGMENT OF ACQUITTAL ASSIGNMENT SIX
In this assignment, the Huffs argue that the State's improper remarks in closing led to their conviction. They assert that the evidence was insufficient to convict them, and that the trial court erred in denying their motion for post-verdict judgment of acquittal. Having found the evidence legally sufficient to convict and the closing remarks proper, we find no merit in this assignment.

LIMITATION OF CROSS-EXAMINATION ASSIGNMENT NINE
The Huffs complain of the court's limitation of their cross-examination of a witness by not allowing them to question why the witness was late to court. This witness's testimony began on one day and was to continue the next morning at 9 a.m. The witness did not appear until 10:30 a.m. The defendants wished to cross-examine him about the reason for his tardiness in order to discredit his ability to remember specific details.
The trial court stated that it believed the prejudicial effect of such testimony would outweigh the probative value, and that it "would interfere with getting at the truth of what [the witness] saw the night [of the murder]."
The court shall exercise reasonable control over the mode and order of interrogating witnesses so as to make the interrogation and presentation effective for the ascertainment of truth. LCE Art. 611A(1). A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. LCE Art. 611B. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. LCE Art. 403.
The defendants had ample opportunity to cross-examine the witness and to attack his credibility concerning his ability to remember and to recall relevant past events without delving into his reason for being late on the second day of his testimony. The defendants have not shown how they were prejudiced by the trial court's limitation. We deem the trial court's error, if any is assumed, was harmless.

ERROR PATENT REVIEW
The trial court stated, "Under Article 930.8 both men have three years to pursue any post-conviction relief remedies to which they are accorded by law." Article 930.8 states that a defendant has three years from the time the judgment and sentence become final. In accord with CCrP 930.8, the trial court is directed to give the defendants notice that the three year prescriptive period in which to apply for post-conviction relief begins to run when the conviction and sentence are final, and to place their acknowledgment thereof in the record.

DECREE
The convictions and sentences of these defendants are
AFFIRMED.