907 So.2d 237 (2005)
STATE of Louisiana, Appellee
v.
Demarein MIMS, Appellant.
No. 39,757-KA.
Court of Appeal of Louisiana, Second Circuit.
June 29, 2005.
*239 Louisiana Appellate Project, Counsel for by Peggy J. Sullivan, Monroe, Wellborn Jack, Jr., Shreveport, for Appellant.
Paul J. Carmouche, District Attorney, Edwin Blewer, III, Lea R. Hall, Catherine M. Estopinal, Assistant District Attorneys, for Appellee.
Before BROWN, PEATROSS and MOORE, JJ.
MOORE, J.
A jury found the defendant, Demarein Mims, guilty as charged of two counts of second degree murder. He was sentenced on each count to life imprisonment without benefit of probation, parole, or suspension of sentence. The sentences imposed will run concurrently. Mims now appeals, claiming that the evidence was insufficient to convict him and trial error admitting hearsay testimony. After review, we affirm the convictions and sentences.

Facts
On the evening of February 27, 2001, Demir Elikara and Cengiz Elikara were murdered during an armed robbery of the Rite Way Liquor Store located at 1750 Martin Luther King Drive in Shreveport. The crime was initially discovered by Judy Gibbs, who saw a black male leaving the scene as she drove into the parking lot of the store. When she entered the store, she saw Demir lying face-down in a pool of blood but still alive. His father, Cengiz *240 Elikara, lay nearby, dead from a gunshot wound to the head. Ms. Gibbs ran from the store and contacted the police. An ambulance took Demir Elikara to LSU Medical Center where he died shortly thereafter.
The robbers stole approximately $3000 from the "vendors" cash register and an unknown amount of money from two customer cash registers. Also taken were several cartons of Newport cigarettes, a large plastic jar containing pennies, and a videotape of the film "My Cousin Vinny" removed from what appeared to be a video surveillance VCR system, but, in fact, was used by the employees to watch movies.
There were bloody footprints on the floor of the crime scene. Two cups of ice sat on the counter and a pint bottle of Absolut Vodka lay on the floor beside Demir. A small amount of cash and change was scattered on the floor. Police found fragments of the bullet projectiles and four spent cartridges. These were matched to a .40 caliber Glock pistol stolen from the trunk of a Sheriff's patrol vehicle two days prior to the murders.
The ice and the pint bottle of Absolut Vodka provided an initial clue that led police to a suspect. Mike Rahman, business partner of Demir Elikara, testified that the store stocked small pint bottles of Absolut Vodka by the case especially for one customer, Holley Mims, Sr., the defendant's father. Mr. Rahman testified that every weekday and twice on weekends, Holley Mims came to Rite Way to buy a pint of Absolut. The defendant, Demarein Mims, was also a regular customer who bought tobacco products in the store.
Two days later, on March 1, 2001, Jerome Thomas turned himself in to police. He confessed to participating in the robbery with Demarein Mims. Thomas claimed that he did not expect to kill anyone during the robbery, and he blamed Mims as the trigger man. Thomas had a pair of Nike shoes that made footprints consistent with the bloody footprints at the murder scene, but a positive "match" could not be made. Demarein Mims was subsequently arrested. He made no statement.
Both men were initially indicted on two counts of first degree murder, but the charges were later amended to second degree murder. At trial, the jury heard the following testimony from people who were with the defendant at various times on the day of the crime.
Two witnesses testified regarding the defendant's intention to commit the robbery on the day of the crimes. Robert Webb, a/k/a "Popeye," testified that he was with Mims and Thomas around noon on the day of the crimes, and he heard them talking about "hitting a lick," meaning a "hustle" or robbery. Tadarius Lee, who was also present, added that the defendant and Thomas were talking about "making a hustle" because they needed some money. Lee indicated that a hustle could be anything from cutting grass to committing a robbery.
Webb testified that later that evening, he was in a car with Monolo Baker, a/k/a "Nolo," and Lonnie Bryant near the Hi Lo store. As they were leaving the Legardy Street area, Mims and Thomas flagged them down and got into the car. Webb said that Mims and Thomas were talking about hitting a lick. Mims and Thomas gave Baker a couple of dollars to rent Baker's .40 caliber Glock pistol. Webb saw Baker give the Glock to Thomas. Mims already had a .380 caliber gun, which he showed to Webb. Mims and Thomas got out of the car near Petee's, a restaurant/grocery store. Webb's group then drove a block over and spent a short time at a party. When they left the party and drove around, they again encountered the *241 defendant and Thomas near the Home Boy Tire Center. Baker asked to get the Glock pistol back, but Thomas said that he needed it. Webb saw Mims and Thomas walking toward Rite Way Liquor located on the other side of the tire store.
About 20 minutes later, Webb and Baker were driving past the Home Boy Tire Center when they saw Gibbs running across the street from the Rite Way Liquor Store. Gibbs was "hollering and crying" that someone in the liquor store was dead. Monolo Baker pulled up and said something to her, and she said, "The boy ran that way."
Webb testified that he rode with Baker to Jackie Robinson Drive, where he saw Mims and Thomas emerging from a trail through the woods. They were wet and muddy. Baker picked them up and retrieved the Glock pistol. According to Webb, Mims had a sweater in his hand and a white bag of money. Thomas was carrying a jug of pennies and Newport cigarettes. Webb said that Baker got his Glock pistol back and asked about the clip, which they had apparently lost. He said that they (Mims and Thomas) paid Baker some money for the use of the Glock and for losing the clip (magazine) to the Glock. One of them said that the other gun had been thrown away or stashed.
Webb testified that Mims was upset with Thomas because he (Thomas) had "stunned out on him." Webb explained that the expression meant that Thomas did not do what he said they were going to do. Webb said Thomas said nothing at the time and made no excuses, but later that evening, he made the excuse that he had "never seen anything like that happen." Webb testified that Mims said he "had to do it all by himself." He understood that to mean the robbery and the shooting. Later, at Baker's house, Webb saw Thomas counting his money, while Mims kept his money in the bag and left Baker's house shortly thereafter.
Thomas' girlfriend, Katrina Bailey, rode with her cousin to pick Thomas up from Baker's house. Katrina testified that Thomas was wearing "gangster Nikes," and he was carrying a Crown Royal pouch and some cigarettes. Katrina said she and Thomas went to her house to spend the night. She hid one of Thomas' shoes in a hole in her closet because it appeared to have blood on the bottom of it.
Meanwhile, Mims and his cousin, Gransihi Mims, went to an apartment belonging to Gransihi's girlfriend, Nicole Mayberry. Mayberry's cousin, Valerie Davis, was also in the apartment. Mayberry and Davis both testified at trial that Mims appeared upset. Neither had ever met the defendant before that night. Mayberry testified at trial that Mims sat on the floor of her apartment and said:
Doo-Doo `fd' up. He shouldn't have killed them people. It wasn't enough money.
This testimony was somewhat conflicting with her earlier statement to authorities. Her prior statement to investigators was that the defendant said:
"Doo-Doo `fd' up. We `fd' up. We took these people's life. It wasn't enough money."
Mayberry denied at trial that she said that to the investigator, but said that if she did it was because she had been pressured by the detectives. She also testified that she was asked to get a motel room for Demarein Mims but she refused because she did not want her name on anything involving the matter. Mayberry admitted that she was high on marijuana and cocaine when the events occurred. She said that she did not see any money.
*242 Valerie Davis testified at trial that the defendant sat on the floor with his money and initially said:
"I fucked up. This money wasn't worth it. This money wasn't worth it."
Later, she said Mims added:
"I killed them people. The money was not worth it."
Davis went on to say that he kept repeating "I fucked up... It wasn't worth it."
Davis testified that Mims had the money out on the floor during this time and that Mayberry, who testified there was no money, would have seen it. She estimated that it was probably about $2,000.00, and consisted of "lots of hundreds."
On cross examination, Davis' trial testimony was impeached by a prior statement she made to investigators in which she allegedly said, (referring to Mims) "he didn't say he killed nobody." When confronted with this statement, Davis testified that she did not remember making the statement to the investigator. She was also unable to recall another statement that she allegedly made to the investigator. She admitted that she used marijuana and cocaine regularly at the time, but she could not recall whether she was high at the time she made her statement to investigators.
Both Mayberry and Davis stated that the defendant asked for a Bible while sitting on the floor, but Mayberry did not have one. Also, both testified that there was a discussion about Mims going to visit a relative in North or South Dakota. While at Mayberry's apartment, Mims called his girlfriend, Stephanie Shorter, on her cell phone to come pick him up.
Shorter testified that she did not remember much about that evening except that Mims said that Thomas "fd" up. According to Davis, Shorter went into Mayberry's bedroom, and when they came out of the bedroom, Shorter was crying. Mayberry told Gransihi that they had to leave her apartment. She didn't want to get involved and refused to use her credit card to get a hotel room for the defendant. Shorter testified that she and Mims left to go to her house in Bossier City.
After trial, Mims was convicted on both counts of second degree murder and given concurrent life sentences without benefit of probation, parole or suspension of sentence. He now appeals, alleging the evidence was insufficient to convict and the trial court erred by admitting hearsay testimony.

Discussion
By his first assignment, Mims contends that the evidence at trial was not sufficient to support the murder convictions under the standard established by the U.S. Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). At trial, Judy Gibbs, testified that she saw only one man leaving the store, and it was not Mims. Additionally, the only footprints found at the scene linked Jerome Thomas, but not Mims. Only Thomas was seen with the Glock pistol, not Mims. Mims contends that those witnesses claiming to have knowledge of matters before and after the crimes, including allegations that Mims had money, "implicated" themselves in some way, possibly as accessories after the fact, but none were charged. Finally, Tadarius Lee testified that "hitting a lick" or a "hustle" could mean many different things, and not necessarily a robbery. Thus, the defendant contends that the evidence showed no more than that he (Mims) participated as an accessory after the fact because he ended up with the money, or possibly that Thomas asked him to hold the money so that he would be implicated.
*243 Additionally, the defendant submitted a supplemental brief focusing on the testimony of Valerie Davis. Davis, he contends, is the only person who claimed he admitted to the shooting. Her testimony was impeached at trial, however, with her prior statement that Mims never said he killed anyone. Moreover, she was intoxicated and had a criminal record and therefore, argues Mims, her testimony is not credible. Citing State v. Higgins, XXXX-XXXX (La.4/1/05), 898 So.2d 1219, Mims contends that in the time that elapsed between the event and her initial statement to police, her trial testimony, the influence of intervening knowledge, and her intoxicated state at the time of the observations all combine to reduce the reasonableness of her conclusions and perceptions. State v. Higgins, supra. Moreover, argues Mims, Ms. Davis' credibility was improperly bolstered by two of the prosecutor's statements in closing argument in which the prosecutor drew the jury's attention to the manner in which Davis testified by speaking close to the microphone and her statement implying that she was not afraid to testify against Mims.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Hunter, 33,066 (La.App. 2 Cir. 9/27/00), 768 So.2d 687, writs denied, XXXX-XXXX (La.10/26/01), 799 So.2d 1150, 2001-2087 (La.4/19/02), 813 So.2d 424. The Jackson standard, which is now codified in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own interpretation of the evidence in place of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or re-weigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, State ex rel. Gilliam v. State, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App. 2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255; Allen v. Louisiana, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *244 State v. White, 28,095 (La.App. 2d Cir. 5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La.1985); State v. Turner, 591 So.2d 391 (La.App. 2d Cir.1991), writ denied, 597 So.2d 1027 (La.1992).
Second degree murder is defined in La. R.S. 14:30. Its applicable provisions in this case provide:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of... armed robbery, ... even though he has no intent to kill or to inflict great bodily harm.
Additionally, La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Thus, in this instance, to obtain a conviction for second degree murder, the state was required to prove that either Mims or Thomas killed the victims with either specific intent to kill or to inflict great bodily harm, or while they were engaged in an armed robbery, even though there was no intent to kill or inflict great bodily harm. La. R.S. 14:30.1 A(1) and (2). The state also had to prove beyond a reasonable doubt that Mims was "concerned in" the commission of the armed robbery so as to be a "principal" in committing each element of that crime. La. R.S. 14:24. A principal to an armed robbery in which the victim is fatally shot by another may be convicted of second degree murder. State v. Huff, 27,212 (La.App. 2d Cir. 8/23/95), 660 So.2d 529, writ denied, XXXX-XXXX (La.5/1/97), 693 So.2d 754; State v. Stokes, 26,003 (La.App. 2d Cir. 6/22/94), 639 So.2d 395, writ denied, 94-1880 (La.11/11/94), 644 So.2d 387.
Our review of the record reveals that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to reasonably conclude that all the elements of the crime of second degree murder were proven beyond a reasonable doubt. Jackson v. Virginia, supra. Mims' role as a principal in the armed robbery is supported by the evidence, including his own admissible hearsay statements presented at trial by witnesses to events before and after the crime. These statements established Mims' participation in a plan with Thomas to commit an armed robbery, including their procurement of the Glock pistol which was determined to be the murder weapon in both deaths and Mims' subsequent statements of regret that the killings occurred for an insufficient amount of money. These facts were corroborated by circumstantial evidence, including Mims' close proximity to the crime scene with a gun immediately before and after the crimes, Mims' possession of a bag of money and his visible emotional distress shortly after the crime. Although there was no direct physical evidence that established conclusively that Mims fired the fatal shots, the evidence was legally sufficient to support the convictions of Mims for second *245 degree murder as a principal to an armed robbery in which the two victims were fatally shot, even if the fatal shots were fired by Thomas. See State v. Huff, supra; State v. Stokes, supra.
Counsel for Mims vigorously argues in his supplemental brief that the testimony of Valerie Davis was not credible based upon her conflicting prior statements to an investigator, the amount of time that elapsed between the murders and her testimony, and her admission that she used marijuana and cocaine regularly. Davis also has a prior criminal history. Mims cites State v. Higgins, supra, to support his position that Ms. Davis' testimony is not credible, and without her testimony, the state's case is insufficient to convict Mims of second degree murder.
In State v. Higgins, supra, the defendant was convicted by a jury of first degree murder and sentenced to death for the killing of Donald Price during an attempted armed robbery. The supreme court reduced the conviction to second degree murder based upon the evidence, overturning the first degree murder conviction on grounds that the evidence was insufficient to show the element of specific intent in order to prove that the defendant was engaged in an attempted armed robbery during the murder.[1] (Emphasis supplied). The state's only eyewitness to the alleged armed robbery and killing was Wanda Brown, who informed police 17 months after Price was killed that she had witnessed the crime. She claimed to be only five or six feet away from the defendant and Price when the defendant shot Price in the head at close range. However, Brown testified that she could not hear what the defendant and Price were saying to each other, and that she did not see the defendant take anything or attempt to take anything of value from the victim. Although she did not hear what they were saying, she testified that Price and the defendant were arguing, and she concluded by the movements of their hands that it was "like if a robbery was taking place." She later admitted on the stand, however, that she had testified that it was an armed robbery because she had read and heard in the newspapers and other media that Price was murdered while the defendant attempted to steal his Ford Explorer. She demonstrated the hand gestures to the court and stated that she did not get that from the media.
The supreme court concluded that a reasonable jury could not have concluded based upon the evidence that the defendant had specific intent to commit an armed robbery. Brown's testimony that an attempted armed robbery was taking place when the defendant shot Price was actually based on interpretations of what she witnessed, not what she actually saw or heard at the time. (Emphasis supplied). The court concluded that factors including the time between the event and her initial statement to police some 17 months after Price's murder, the influence of media coverage, and the intoxicated state she was in at the time of her observations,[2] combined to reduce the reasonableness of her conclusions and perceptions. Id. at 11, 898 So.2d at 1229. On *246 the other hand, the supreme court in Higgins concluded that Brown's testimony identifying the defendant as the perpetrator of the murder was not influenced by her exposure to the media and despite her inebriated state because she was certain in her identification of the defendant.
We distinguish State v. Higgins, supra, from the instant case for several reasons. In Higgins, the state's witness, Wanda Brown, did not speak with investigators until 17 months after the crime, and she admitted on the stand that she had been influenced by the newspaper and media regarding her interpretation of the hand gestures made by the defendant and victim prior to the murder. In the instant case, Ms. Davis made the statement to an investigator only one month after the crime. This statement is somewhat inconsistent with her trial testimony. She told the investigator that Mims said he had "fucked up," "but he didn't say he killed nobody." At trial, three years later, she said that Mims said, "I fucked up. This money wasn't worth it...." However, she testified further that he later said, "I killed them people. The money was not worth it." Ms. Davis admitted to using cocaine and marijuana on that day, but she denied drinking any alcohol. Mims contends that Ms. Davis has interpreted the statement "I fucked up" to mean "I killed them people" since the time she made her original statement to the investigator.
In Higgins, Wanda Brown admitted that her interpretation of the hand gestures was influenced by the media. She did not hear the conversation between the defendant and Price. By contrast, in the instant case, Ms. Davis saw Mims with the money and heard his words. She steadfastly stood by her trial testimony that she actually heard Mims say he killed the victims even after the defense attacked her credibility. Unlike Ms. Brown in Higgins, Ms. Davis did not state that she was influenced by the media to re-interpret or embellish what she actually heard into a different statement as suggested by the defense.
We also note that in Higgins, Wanda Brown was the only witness. Faced with the fact that nothing of value was taken during the murder and given the circumstances, Brown's testimony alone in Higgins was insufficient evidence of specific intent to commit an armed robbery. In the instant case, Ms. Davis' testimony was elicited to show that Mims was a principal to an armed robbery and murder. Even if the jury ignored Ms. Davis' testimony that Mims stated that he killed the victims, the remainder of her trial testimony is consistent with her prior statements to the investigator and could reasonably be taken with the other evidence to show that Mims was a principal to the crime. Mims' suggestion that Thomas could have asked him to hold the money for him, so as to implicate him, does not offer a reasonable alternative interpretation of the evidence in light of the other evidence of the conspiracy presented.
Mims also complains that the prosecutor impermissibly bolstered the credibility of Valerie Davis by directing the jury's attention to the manner in which she testified and the fact that she appeared unreluctant to testify against him.
The district attorney is afforded considerable latitude in making closing argument to the jury. State v. Lowery, 33,905 (La.App. 2d Cir. 2/28/01), 781 So.2d 713, writ denied, XXXX-XXXX (La.2/22/02), 809 So.2d 978; State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417. A district attorney may express an opinion about the defendant and/or the evidence presented by the defendant when it is apparent that her opinion is based upon the evidence of record. State v. Lowery, supra; State v. *247 Frost, supra at 432. Commenting on the credibility of the witnesses is proper and within the scope of closing argument. State v. Wafer, 31,078 (La.App. 2d Cir. 9/23/98), 719 So.2d 156, writ denied, 99-1114 (La.10/1/99), 747 So.2d 1137. After reviewing the record and closing statements, we find that there was no impropriety in the statements made or arguments by the district attorney during closing argument. In each instance of which defendant complains, the facts or statements regarding credibility mentioned by the district attorney in closing argument accurately depict or were derived directly from the evidence at trial.
The jury was also informed that Ms. Davis had used drugs that day and that she had a prior criminal record. The jury is entitled to believe and assign weight to Ms. Davis' testimony in light of these considerations. An appellate court does not assess the credibility of witnesses or re-weigh evidence. State v. Smith, supra. The jury obviously found that the testimony of Ms. Davis was credible and rejected Mayberry's version. Based upon our review of the record, we surmise that the jury possibly concluded that Ms. Davis' very detailed testimony, including the presence of the money on the floor, was more internally consistent with Mims' other statements that "this money was not worth it," irrespective of her testimony that Mims' stated that he made a mistake or that he killed the victims. Webb also testified that he saw Mims with a bag of money after the crime. Mayberry testified that there was no money, but said that Mims made the statement that Thomas messed up and it wasn't enough money. This court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. See State v. Gilliam, supra. Those determinations should not be disturbed on appeal.
Accordingly this assignment is without merit.
Turning to Mims' second assignment of error, Mims contends that the trial court erred by allowing hearsay testimony of statements allegedly made by Jerome Thomas to be introduced as evidence.
The state notified the court that it intended to elicit non-hearsay testimony of statements by Jerome Thomas pursuant to La. C.E. art. 801(d)(3)(b) because the statements were made while participating in a conspiracy to commit a crime. A hearing was held outside the presence of the jury in which the state presented a prima facie showing of a conspiracy. Investigator Rusty McKinley was present during the interviews of Lonnie Bryant and Roger Webb. He testified regarding the information obtained from those interviews, including statements attributed to Thomas that were made on the day of the murders both before and after the crime. After the testimony, the defense objected to the introduction of any statements made by Jerome Thomas. The trial court ruled that the evidence was admissible, and Mims' objections to any and all statements made by Jerome Thomas were noted for the record.
Mims' complaint is based upon the admission of statements attributed to Thomas after the murders were committed. The defense contends that the requirements of State v. Dupree, 377 So.2d 328 (La.1979) were not met in this instance. Statements are admissible only if a prima facie case of conspiracy has been established and the statements were made in furtherance of the common enterprise and during its continuation. State v. Dupree, supra. Webb, Mims argues, should not have been allowed to testify about a conversation with Thomas and Mims after the crime concerning a lost magazine ("clip") to the Glock pistol, or the statements *248 by Thomas regarding his having never seen anything like that, referring to the homicide. Mims contends that his right to confront and cross-examine a witness is compromised, and any law affecting that right should be strictly construed. He concludes that the error committed here requires reversal.
The state asserts that the defense's objection was not properly preserved because it made a blanket objection to any testimony regarding any statements made by Thomas, not specifying those statements made after the crime. The state further contends that under La. C.E. art. 801(D)(3)(b), and State v. Lobato, infra, and State v. Lavalais, infra, the conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or termination of the conspiracy. It argues that Mims demonstrated no effort to withdraw from the conspiracy, and submits that the evidence showed that the conspiracy continued through the division of the loot and Mims' attempt to conceal himself and flee the jurisdiction. Furthermore, the state contends that the statements by Webb about which the defense complains refer to Webb relating what "they" said and did, which indicates the participation of both Mims and Thomas in the discussions. The statements made by Mims are not hearsay under La. C.E. art. 801(D)(2)(a), which excludes statements offered against a party that are his own statements. Furthermore, it asserts that even if some statement by Thomas can be inferred as a part of the discussions, its admission is harmless error. Finally, the state contends that admission of statements attributed solely to Thomas were harmless error, especially in light of Mims' own statements that Thomas had "stunned out" and he had to do it all by himself.
Our reading of the transcript of the evidentiary hearing at issue clearly shows that the alleged error complained of was objected to at the time of occurrence and preserved for consideration on appeal under La. C. Cr. P. art. 841. See also, State v. Butler, XXXX-XXXX (La.App. 1 Cir. 10/7/94), 646 So.2d 925, rehearing denied, 01/18/95, writ denied, XXXX-XXXX (La.6/16/95), 655 So.2d 340, in which the defendant's objection to hearsay testimony concerning out-of-court statements of a co-defendant was held sufficient to preserve for appellate review the claim that such testimony violated the defendant's rights of cross-examination and confrontation.
In State v. Dupree, supra, the supreme court held that statements made by co-conspirators, which occurred during a custodial interrogation following their arrests and which tended to establish that the defendant was involved in an attempted fire bombing, were not made in furtherance of a conspiracy and occurred after it had been abandoned. Accordingly, the statements did not fall within the statutory conspirator exception to the hearsay rule and their admission constituted a reversible error.
The statutory hearsay exception contained in former La. R.S. 15:455 under which Dupree was decided has been amended to reflect that such evidence is controlled by the provisions of the Louisiana Code of Evidence, which was enacted by Acts 1988, No, 515, § 1. Hearsay is defined by the Code as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). La. C.E. art. 801(D) provides in pertinent part:
D. Statements which are not hearsay. A statement is not hearsay if:
* * *

*249 (2) Personal, Adoptive and Authorized Admissions. The statement is offered against a party and is:
(a) His own statement, in either his individual or a representative capacity.
(3) Relational and privity admissions. The statement is offered against a party, and the statement is:
* * *
(b) A statement by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy is established;
* * *
Under La. C.E. art. 801(D)(3)(b), a statement is not hearsay if it is made by a declarant while participating in a conspiracy to commit a crime and in furtherance of the object of the conspiracy, provided that a prima facie case of conspiracy has been established. After the state presents a prima facie case of conspiracy, the burden of proof shifts to the defendant to present evidence showing his withdrawal from the conspiracy prior to the time the statements were made by his co-conspirators. The conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or termination of the conspiracy. Such affirmative actions include making a clean breast through confession to the authorities as well as notification to the co-conspirators of abandonment or withdrawal. State v. Lavalais, 95-0320 (La.11/25/96), 685 So.2d 1048, rehearing denied, 12/13/96, cert. denied, Lavalais v. Louisiana, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997), citing State v. Lobato, 603 So.2d 739, 746 (La.1992).
The state made its prima facie case of a conspiracy through the testimony of an investigator present during the interview of the testifying witness that Mims and Thomas planned and executed the instant armed robbery. Thereafter, Mims presented no evidence showing his withdrawal from the conspiracy prior to the time when the statements were made by Thomas, his co-conspirator. See State v. Lavalais, supra. Applying the co-conspirator exception to the evidence in this case, we conclude that the statements made after the crime and attributed to the co-conspirator Thomas regarding disposing of the pistol and losing the Glock clip were correctly admitted into evidence because the out-of-court statements were made in furtherance of a continuing conspiracy even after the crime had been committed. The defendants continued to work in concert to dispose of a weapon and return the Glock pistol to Baker. They also divided the money and there was testimony regarding Mims' plans to leave the area. All these facts form part of the res gestae of the continuing conspiracy.
Also, Mims' statement that Thomas had stunned out on him and that he had to do it himself fall under the hearsay exception contained in 801 D(2)(a). This was a statement made by Mims himself offered against him.
However, we agree that the statement made by Thomas to Webb later in the evening that he had "never seen anything like that happen," presumably talking about the murders, were not statements made in furtherance of the conspiracy and should not have been admitted. However, we do not think this error calls for reversal.
When hearsay evidence is improperly admitted at trial, the appellate court must decide whether the evidence contributed to the verdict. If the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony introduced at trial, its admission is considered *250 harmless. State v. Williams, 35,911 (La.App. 2d Cir. 9/18/02), 828 So.2d 180; State v. Coleman, 32,906 (La.App. 2d Cir. 4/5/00), 756 So.2d 1218, writ denied, 2000-K-1572 (La.03/23/01), 787 So.2d 1010.
The statement by Thomas that he had never seen anything like that did not, in our view, result in or contribute to the verdict in this case, particularly considering all the other evidence in the case. Thus, its admission should be considered harmless. State v. Williams, supra; State v. Coleman, supra.
Except for this admission, which is harmless error, our review of the record supports the trial court's determination that statements made by co-conspirator Jerome Thomas were admissible under La. C.E. art. 801(D)(3)(b) and those by Mims under 801(D)(2)(a). A majority of the statements at issue were attributed collectively to Thomas and Mims.
This assignment is therefore without merit.

CONCLUSION
For the foregoing reasons, Mims' convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Here, the state conceded that a completed armed robbery had not taken place because the evidence did not show that Mims had taken "anything of value." Thus, the state had to show that Mims was attempting an armed robbery and had to show specific intent.
[2] The court stated that "even without considering her alcohol consumption on the night in question," Brown's testimony was not sufficient to constitute proof beyond a reasonable doubt of attempted armed robbery in light of her ambivalent and equivocal testimony. Id. at 15, 898 So.2d at 1231.