BROWN, Chief Judge.
| defendant, Jerome Thomas, appeals his convictions of two counts of second degree murder and concurrent sentences of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. We affirm.

Facts

On February 27, 2001, while working at the Rite Way Liquor Store located at 1750 Martin Luther King Drive in Shreveport, Louisiana, Demir Elikara and his father, Cengiz Elikara, were shot and killed during an armed robbery. More than $3,000 was taken in the robbery, as well as several cartons of Newport cigarettes, a large plastic jar of pennies, and a videotape of the film “My Cousin Vinny” which the assailants believed to be footage from a video surveillance system but which was actually used by store employees to watch movies.
At the scene officers found bloody footprints on the floor, two cups of melting ice on the counter, a pint bottle of Absolut Vodka on the floor next to Demir, and several spent shell casings.[1] Two guns which did not appear to have been fired were located behind the store counter.
Two days later, on March 1, 2001, defendant, Jerome “Doo Doo” Thomas, accompanied by his uncle, mother, and sister, came to the Shreveport Police Department wanting to talk about the double homicide at Rite Way Liquor. Detectives Gary Foster and Kevin Crow were in the J^office. Defendant’s mother told Detective Foster that she thought her son might need an attorney. Jerome told the detectives that he wanted to talk about the case but didn’t know whether he might need a lawyer. Detective Foster told defendant he would try to get him an attorney. Because it was late in the evening, Det. Foster called an assistant district attorney, *1181 who said he would call a district judge to see if he could have an attorney appointed.
While the officers were waiting to hear back from the ADA, defendant spoke with his family in private. Defendant’s family then told Det. Crow that defendant wanted to give a statement and didn’t want to wait for an attorney. Defendant requested that his mother not be present during his statement.
After being advised of his Miranda rights and waiving these rights, defendant told Dets. Foster and Crow that he was a college freshman and could read and write the English language. He also stated that he came to the police station voluntarily. Defendant then confessed to being present during the robbery, which he claimed was committed by Demarein Mims. According to defendant, he did not expect anyone to be killed during the robbery and he named Mims as the triggerman. Defendant described Mims’ gun as a .40 caliber Glock and denied receiving any of the money from the robbery. Defendant admitted that he complied with Mims’ order to remove the videotape from the VCR. Once he got the tape, he gave it to Mims, and the pair fled the store on foot. Defendant’s statement was recorded in its entirety.
| .¡Defendant was thereafter interviewed by Detective Sean Hinderberger, the officer in charge of the Rite Way murder/robbery investigation. Detective Hinderber-ger did not readvise defendant of his rights and this interview was not recorded. Defendant was immediately placed under arrest. Demarein Mims later turned himself in to the police.
Defendant and Mims were indicted on two counts of first degree murder, but the charges were later amended to two counts of second degree murder. Demarein Mims was convicted as charged, and his conviction and sentence were affirmed by this court in State v. Mims, 39,757 (La.App. 2d Cir.06/29/05), 907 So.2d 237.
At defendant’s trial, Robert “Popeye” Webb testified that he was with defendant and Mims around noon on February 27, 2001, on Legardy Street, and he heard them talking about “hitting a lick,” or “doing a lick,” which refers to committing a robbery.
Webb testified that later that evening, he was in a car with Monolo “Nolo” Baker and Lonnie Bryant. Webb said that Baker “rented” Mims and defendant his .40 caliber Glock pistol. Defendant and Mims already had a .380 caliber gun. Later that evening, Webb saw defendant and Mims walking toward Rite Way Liquor Store. About 20 minutes later, Webb and Baker were driving near the liquor store when they saw Judy Gibbs, the customer who discovered the crime, running across the street. She was “hollering and crying” that someone in the liquor store was dead. Baker pulled up and asked her whether she had seen somebody run out of the store, and she said that she had seen a man running across the street.
4Webb and Baker then drove to Jackie Robinson Drive, where they observed defendant and Mims emerge from a trail in the woods. The two men were muddy and out of breath. Baker picked them up and got back his Glock. The clip was missing from the weapon. Defendant and Mims paid Baker some money for using the gun and losing the clip.
Webb testified that Mims was upset with defendant because defendant had “frozen up” on him. According to Webb, Mims said he “had to do it all by himself.” Later, at Baker’s house, Webb saw defendant counting his money from the robbery, which Webb thought was about $800-$900.
Pursuant to a search warrant, the police recovered the Glock pistol and the crime *1182 lab matched the casings and bullet fragments recovered in the investigation to the pistol. This Glock pistol had been taken from the trunk of a Caddo Parish Sheriffs patrol car that had been stolen two days prior to the robbery/murders.
Defendant’s girlfriend, Katrina Bailey, testified that around 5:00 p.m. on February 27th, defendant and Mims were at her house. Defendant and Mims left her house on foot. Katrina saw defendant again later in the evening when she rode with her cousin, Stephanie Shorter, who was Mims’ girlfriend, to pick defendant up from Nolo Baker’s house. Katrina said that she and defendant went to her house to spend the night. She hid one of defendant’s Nike shoes in a hole in her closet because it looked like it had blood on it. Katrina stated that some blue and black Nikes defendant usually kept in her carport were gone the next morning. Later that day, ^defendant called Katrina on her cell phone while she was at school and told her that he and Mims were involved in the armed robbery of the Rite Way Liquor Store the previous night. Defendant told Katrina that he was the “watchman” and that Mims shot both owners three times.
Stephanie Shorter’s testimony basically corroborated that of Katrina, adding that when the two arrived at Baker’s home, she saw Baker’s gun on the coffee table. Stephanie also stated that Mims contacted her around 3:00 a.m. the next morning and she picked him up from his cousin’s apartment. Mims was upset and drunk. Stephanie admitted to moving one of defendant’s “gangster” Nikes from Katrina’s home to Mims’ cousin’s apartment and later showing the police where it could be found. During the investigation, it was determined that defendant’s “gangster” Nikes made footprints “consistent” with the bloody footprints at the murder scene but that a positive “match” could not be made nor could any blood evidence be recovered from the shoes, which appeared to have been washed.
Elmer Henderson, who worked with and had known defendant for many years, testified that in early March 2001, defendant started crying while riding with Henderson but refused to tell Henderson what was wrong. After they arrived at defendant’s sister’s home, defendant locked himself in the bathroom. Henderson, who was a large man, pushed in the door and persuaded defendant to tell him what he was crying about. Defendant confessed to Henderson his involvement in the robbery/murders and admitted that both he and Mims had been armed. Defendant told Henderson that he (defendant) “just froze up” when Mims “started murdering folks.”
hA jury found defendant guilty as charged, and the trial court sentenced him to concurrent life terms. Defendant has appealed his convictions and sentences and has filed a supplemental pro se brief.

Discussion

Sufficiency of the Evidence

The proper standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
Louisiana Revised Statute 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet *1183 in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
As explained by this court in De-marein Mims’ case:
[T]o obtain a conviction for second degree murder, the state was required to prove that either [Demarein] Mims or [defendant, Jerome] Thomas killed the victims with either specific intent to kill or to inflict great bodily harm, or while they were engaged in an armed robbery, even though there was no intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1) and (2). The state also had to prove beyond a reasonable doubt that Mims was “concerned in” the commission of the armed robbery so as to be a “principal” in committing each element of that crime. La. R.S. 14:24. A principal to an armed robbery in which the victim is fatally shot by another may be convicted of second degree murder. State v. Huff, 27,212 (La.App. 2d Cir.08/23/95), 660 So.2d 529, writ denied, 96-0212 (La.05/01/97), 693 So.2d 754; State v. Stokes, 26,003 (La.App. 2d Cir.06/22/94), 639 So.2d 395, writ denied, 94-1880 (La.11/11/94), 644 So.2d 387.
7State v. Mims, 907 So.2d at 244.
The record reveals that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to reasonably conclude that all of the elements of the crimes of second degree murder were proven beyond a reasonable doubt as required by Jackson v. Virginia, supra. Defendant’s role as a principal in the armed robbery is supported by the evidence, in particular, his own statements to police. These statements established defendant’s participation with Mims in planning the armed robbery, including their use of the Glock pistol. Defendant’s subsequent statements to Katrina Bailey and Elmer Henderson that he (defendant) was involved in the robbery at the liquor store and the testimony of Robert Webb and Stephanie Shorter clearly established defendant’s culpability. The evidence was legally sufficient to support his convictions for second degree murder as a principal to an armed robbery in which two victims were fatally shot, whether or not Mims did all the shooting. See State v. Huff, supra; State v. Stokes, supra.

Denial of Motion for Mistrial

During his rebuttal closing argument, the state’s attorney said, “You have officers putting in man hours to the point where they’re working day by day without sleep. You have an investigation that lasts weeks.... I ask on behalf of our victims, on the police investigating this case, ...” Then following an objection the ADA stated, “I ask (for a guilty verdict) on behalf of the victims who seek justice in this case.... ”
Is After the jury retired for deliberations, defense counsel moved for a mistrial, claiming that the prosecutor’s remarks were designed to elicit sympathy for the victims and for the police. We find that there was nothing inappropriate about the ADA’s comments. They simply stated that the police worked hard on the case, and the victims deserved justice. We further note that defendant did not ask the court to instruct the jury about what constituted an appropriate closing argument.

Denial of Motion to Suppress

In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court recognized the coercive atmosphere created by police custody and created a procedural mechanism to safeguard a defendant’s Fifth Amendment Rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that *1184 he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him. Id,.; State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000).
Once a suspect expresses his desire, at any stage of the process, for counsel, all questioning must cease, and the accused may not be further questioned unless the accused initiates contact with the police and waives his earlier request for counsel. Id.; State v. Murray, 36,137 (La.App. 2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020.
|flThe record supports the trial court’s finding that defendant clearly and unequivocally initiated, through his family, his desire to talk with the officers and validly reversed his earlier hesitancy to speak without counsel. See State v. Hobley, supra; State v. Murray, supra. Defendant’s decision was made in the presence of close and trusted family members. The record affirmatively shows that defendant was advised of and waived his rights as per Miranda prior to giving his first recorded inculpatory statement. See State v. Bowers, 39,970 (La.App. 2d Cir.08/19/05), 909 So.2d 1038; State v. Roddy, 33,112 (La.App. 2d Cir.04/07/00), 756 So.2d 1272, writ denied, 00-1427 (La.05/11/01), 791 So.2d 1288. The record also affirmatively shows that the statements were free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. See La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Bowers, supra; State v. Roddy, supra.

Jury Composition

During trial, juror Deveda Moore brought it to the attention of the trial court that she knew Richard Beighley, a criminalist who was a state’s witness concerning firearm identification and footwear impressions. Ms. Moore was then questioned by the trial court outside the presence of the other jurors. The trial court noted that in voir dire questioning Ms. Moore stated that she knew Beighley when the list of prospective witnesses was read to the jury panel. The trial court noted that there was no follow-up questioning by the attorneys at that time. In response to the trial court’s questions, Ms. Moore stated that she could be a fair and impartial juror and|1f)couId evaluate Beigh-ley’s testimony “just like any other witness.” The trial court concluded that Ms. Moore could be fair and impartial, and she continued to serve as a juror. Defense counsel objected and requested that he be allowed to question Ms. Moore. Noting the sensitivity of questioning a sitting juror, the trial court denied the request.
A trial judge is granted great discretion in determining whether to seat or reject a juror for cause and such rulings will not be disturbed without a showing of an abuse of that discretion. State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Disclosure during the trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. State v. Wilson, 01-0625 (La.App. 3d Cir.12/28/01), 806 So.2d 854, writ denied, 02-0323 (La.09/13/02), 827 So.2d 1121; State v. Peterson, 446 So.2d 815 (La.App. 2d Cir.1984). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. State v. Wilson, supra, citing State v. Hodgeson, 305 So.2d 421 (La. *1185 1974); State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied, 567 So.2d 93 (La.1990).
The record reflects that the trial court made a sufficient inquiry and its decision to limit questioning and to allow the juror to continue was within its discretion.[2]
| ^Excessive Sentence
Defendant was convicted as charged of two counts of second degree murder. The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). Where there is a mandatory sentence there is no need for the trial court to justify a sentence it is legally required to impose. State v. Koon, 31,177 (La.App. 2d Cir.02/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992).
Defendant was a willing participant in an armed robbery which resulted in the senseless and brutal killing of two men. Defendant’s life sentence is neither grossly disproportionate to the severity of the offense nor shocking to the sense of justice and is not unconstitutionally excessive. State v. Lobato, 603 So.2d 739 (La.1992); State v. White, 37,815 (La.App. 2d Cir.12/17/03), 862 So.2d 1123.

Conclusion

For the reasons set forth above, defendant’s convictions and sentence are affirmed.

. Mohammed "Mike” Rahman, Demir Eli-kara's business partner, told officers that the store stocked the small pint bottles of Absolut for only one customer, Holley Mims, Sr. At trial, Rahman testified that every weekday and twice on weekends, Holley Mims came to the Rite Way to buy a pint of Absolut. Rah-man stated that Mims' son, Demarein Mims, was also a regular customer who bought tobacco products at the store.

. Also during trial, juror Jo Ann Taylor reported to Caddo Parish Deputy Daryl Smith that she knew defendant's father. With the jury out of the courtroom, the trial court questioned Deputy Smith regarding the matter. Deputy Smith related that Ms. Taylor told him that she had just realized that she worked with defendant's father at the hospital. The trial court then questioned Ms. Taylor on the record and outside the presence of the other jurors. Ms. Taylor stated that she works at the same hospital with defendant's father and that defendant’s mother used to work there too; however, she is not friends with defendant's parents and did not see them on a daily basis, she just knew them well enough to say hello. Ms. Taylor assured the trial court that this would not affect her ability to be a fair and impartial juror in this case. After hearing arguments from counsel, the trial court determined that Ms. Taylor could be a fair and impartial juror. There was no objection to the trial court's ruling regarding Ms. Taylor's continued service. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841; State v. Smith, 39,698 (La.App. 2d Cir.06/29/05), 907 So.2d 192; State v. Bosley, supra; State v. Hamilton, 594 So.2d 1376 (La.App. 2d Cir.1992).